## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TINA L. VIGIL,

        **Plaintiff,**

vs.                                                                     No.  07cv1086 DJS

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Vigil's) Motion to Reverse or Remand for a Rehearing **[Doc. No. 16]**, filed on March 10, 2008, and fully briefed on May 14, 2008.  On July 13, 2005, the Commissioner of Social Security issued a final decision denying Vigil's claim for supplemental security income payments.  Vigil seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

### I.  Factual and Procedural Background

Vigil, now forty-nine years old (D.O.B. October 28, 1958), filed her application for supplement security income payments on August 20, 2004 (Tr. 67), alleging disability since January 1, 1995 (*Id.*), due to hypothyroidism, fatigue and anemia secondary to menorrhagia and depression.  Vigil has a high school education and no past relevant work.  Tr. 16.  On June 6, 2007, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Vigil was not

disabled as she retained "the residual functional capacity (RFC) to perform a full range of medium work." Tr. 15.  The ALJ further found Vigil's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible."  Tr. 15A.  Vigil filed a Request for Review of the decision by the Appeals Council.  On September 15, 2007, the Appeals Council denied Vigil's request for review of the ALJ's decision.  Tr. 6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Vigil seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

2

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Vigil makes the following arguments: (1) the ALJ's finding that her depression is not severe is not supported by substantial evidence; (2) the ALJ erred when he conclusively applied the Medical-Vocational Guidelines (the grids); the ALJ's RFC finding is not supported by substantial evidence; and (4) the ALJ's credibility finding is flawed.

## A.  Medical Records

On February 27, 2004, Vigil went to the UNM Family Practice Clinic for a refill of her thyroid medication.  Tr. 129.  The medical notes indicate Vigil was on Synthroid 125 micrograms every day and hair vitamins.  The nurse practitioner noted:

> **HISTORY OF PRESENT ILLNESS:**
> 1. The patient needs lab work for thyroid.  She tried to get it refilled and was unable to do so.  She denies any weight gain or dry skin, she does complain of some fatigue, but may be due to some increased stress.
> 2. Depression– she is feeling increased sadness, secondary to some relationship problems with her boyfriend and she fears that he is going to move out after 15 years.  She denies any suicidal ideations, but she would like to try St John's wort, rather than any other prescription medicine at this point.
>
> **OBJECTIVE:**
> Vital signs– 112/76, pulse of 87, respirations 16, temperature of 99, her weight is 150.0.  In general, the patient is a 45-year-old woman in no acute distress, alert and oriented x 3. Thyroid is without nodules, not enlarged.  Lungs are clear bilaterally.  Hear is regular rate and rhythm without murmurs.
>
> **ASSESSMENT AND PLAN:**
> 1. Hypothyroidism– TSH today, await results and call in refill once we get that result.
> 2. Depression– Trial of St. John's Wort as per her request.  She is to return to the clinic with her primary care physician for health care maintenance and reevaluation of her depression.

Tr. 129.

Sometime after September 29, 2004 (date illegible on medical record), Vigil went to UNM hospital with complaints of feeling "tired, fatigue– more than usual– can't concentrate."  Tr. 143.

4

Vigil stated her last menstrual period was on September 29, 2004, and complained that her menstrual cycles were getting irregular.  Vigil reported that she felt fatigued, was having problems sleeping and was experiencing moodiness.  Vigil reported she was under increased stressors due to her boyfriend of 13 years leaving her.

The physician assessed Vigil with (1) depression, (2) perimenopausal, and (3) hypothyroidism.  The physician ordered a CBC (complete blood count) with differential, an FSH (follicle-stimulating hormone/ordered to determine if a woman has reached menopause), a TSH (blood test used to check for thyroid problems), a Chem 10, a random cholesterol, an HDL, an RPR(screening test for syphilis), and a Hepatitis panel (blood test used to find markers of hepatitis infection).

On November 2, 2004, Vigil returned to UNM hospital for her follow up.  Tr. 142.  Vigil complained of a "bump on back of tongue– flu shot– discuss meds– check R foot-bone."  During the history intake, Vigil reported that her last menstrual period was on October 29, 2004.  Vigil described her menstrual period as heavy, requiring two pads a day.  Vigil also reported having trouble swallowing, having occasional palpitations, and loss of hair.  The physician assessed Vigil with anemia, depression, osteoarthritis, and hypothyroidism.  Based on her TSH, the physician decreased the dosage of Levoxyl (indicated for the treatment of hypothyroidism) from 125 mcg to 100 mcg, increased the Effexor (antidepressant) to 75 mg, prescribed an iron supplement for her anemia and ibuprofen and glucosamine for her osteoarthritis.  The physician directed Vigil to return in two months for a follow up.

On November 8, 2004, Dr. G. T. Davis, an agency consultant, evaluated Vigil.  Tr. 131-133.  Vigil reported she had been a patient at the UNM Family Practice Center since about 1995

5

and had seen Dr. Margaret Western within the last month.  According to Vigil, she was diagnosed with hypothyroidism in 1995 and had been on thyroid replacement ever since.  Vigil complained that ever since 1995 "she has experienced fatigability and generally feeling tired, even though she is on thyroid replacement."  Tr. 131.  Vigil also reported a history of depression beginning in 1994 when her mother died.  Vigil claimed she had undergone some counseling at that point. Vigil reported she still got tearful when she thinks about her mother's death.  Her primary care physician had recently placed her on Effexor, 75 mg. twice a day.  Vigil reported the Effexor was helping a little with her fatigue and her depression.  Vigil also reported she was working through a stressful time due to her boyfriend of 13 or 14 years leaving her for another woman.

Vigil informed Dr. Davis that she was placed on iron pills because "she had an episode of rectal bleeding" the previous year.  Vigil reported she was still taking the iron pills and was still anemic.  Dr. Davis performed a physical examination, noting:

PHYSICAL EXAMINATION:

GENERAL:      She seems to be alert and oriented, in no distress.

VITAL SIGNS: Blood pressure 135/100, pulse 90, respirations 16, height 61 ½  inches, weight 137 pounds.  Uncorrected far vision:  20/25 both eyes, near vision: 20/70 on the right, 20/40 on the left.  Hearing and speech were intact.

HEENT:  The lid conjunctivae were pink and she did not appear grossly anemic. There was no exophthalmos of the eyes, and the thyroid gland was not enlarged or palpable. She had no tremor.

Her gait was normal, balance good.  She could walk on toes and heels, and squat without difficulty.  Limb measurements in the upper and lower extremities were symmetrical without atrophy.

HEART:  Regular rhythm.  There were no gallops or murmurs.

LUNGS:  Clear.

ABDOMEN:  Normal.

6

NECK, BACK:  She had full mobility of the neck, mid back and low back.  She reported no spinal region complaints.

UPPER EXTREMITIES:  She had full mobility and function of the joints of the upper limbs.  Deep tendon reflexes were 2+.  Hand functions were normal and motor and sensory functions were normal.

LOWER EXTREMITIES:  In the lower extremities she had good motion of the hips, knees and ankles.  Motor, sensory and reflex functions were normal.  She had some small spider-type varicose veins in the distal thigh and calf area.

SUMMARY:  Examinee has about a ten year history of hypothyroidism, apparently treated effectively with medication.  It would be unlikely that her fatigue complaints would be related to thyroid difficulties.  She reports an occasional panic attack in the last three years, and some depression that may be situational and related to her recent breakup and the death of her mother ten or so years ago.  It may be helpful to correlate this report with the psychological assessment.

She needs to have some follow up to have her blood pressure rechecked.  She commented that sometimes her doctor tell her that her blood pressure is a little high and sometimes it is normal.  Eventually she may need some medication for this.

I do not see anything on the endocrinologic, musculosketal or neurological exams the cause of which for risk avoiding or therapeutic benefit it would appear to be medically necessary to advise her to limit or restrict life or work activities in which she wished to engage.  She apparently has not worked for many years, since her child was born in 1979.  She reports having a 12th grade education.  It may be helpful for her to work through the Department of Vocational Rehabilitation (DVR).

Tr. 132-133 (emphasis added).

On January 18, 2005, Vigil returned to UNM Family Practice Clinic.  Dr. Western noted Vigil was in for a routine follow up.  Tr. 140-141.  Dr. Western listed depression, osteoarthritis, hypothyroidism, and a history of anemia under "Problem List."  The medication list included Levoxyl, Effexor and flaxseed oil.  Dr. Western noted:

**SUBJECTIVE:**
The patient says she is sleeping a lot better with the Effexor and she can tell it's doing something but it is not quite taking care of depression completely.  She has no suicidal ideation but she has a hard time getting motivated to do anything.  She is still having some problems with her boyfriend and he is of the opinion that it is all imaginary.

She is still quite concerned about losing her hair.  She tried some vitamins that were specifically for hair.  She had called since the last time I examined her, to find out whether I

thought it was a good idea to get a perm and given the hair loss, the thyroid problems and the depression problems, I advised her against it at that time. She asked again about it today and I would still like her to wait and see if she can get the hair loss under control before she gets another perm. She asked if she could use Rogaine and I said that would be fine.

**OBJECTIVE:**

Temperature 36.6, pulse 76, respirations 16, blood pressure 112/67. Her weight is 140 lbs. In general she is a very nervous appearing woman with uneven teeth but in no apparent distress.

HEENT: Extraocular movements intact.

Neck is without goiter or lymphadenopathy. There is no discharge from nose or ears.

Cardiovascular: Regular rate and rhythm, no murmurs.

Lungs: Clear to auscultation bilaterally.

Abdomen: Benign.

Extremities: No pedal edema.

**ASSESSMENT AND PLAN:**

1.      Depression. She is to continue taking the Effexor at 150 for three more weeks and at that time, if her depression is not significantly improved, we will begin a taper of Effexor and start with the Wellbutrin. The patient is very concerned about sexual side effects and that is why we are staying away from SSRIs, also because she failed Zoloft in the past and got very sick.

2.      Hypothyroidism: I am ordering a TSH, T3 and a free T4. It will have to be done in the future as she is my last patient today and the lab is already closed at 4:45 p.m. She has been on the 100 mcg of Levoxyl, down from 125 mcg for at least three months now.

3.      Osteoarthritis: I advised her to begin taking Glucosamine sulfate for the arthritis symptoms, especially in her feet and her hands. She is to take 1,000 mg po daily. She is concerned about the price but the brands that are recommended are roughly three months worth.

4.      The patient is to go ahead and get some Citrucel to help with the constipation, to continue taking the flaxseed oil for cholesterol and if she would like to she can start some Rogaine.

5.      Also, in three weeks we are going to do her Pap smear as she has not had none since 1999.

Tr. 140-141.

On February 2, 2005, Finian J. Murphy, Ed.D, performed a consultative mental health

evaluation. Tr. 144-148. Dr. Murphy noted Vigil had not worked at any full time jobs because

she had been a housewife all of her adult life.  Tr. 145.  Under Psychiatric History, Dr. Murphy

noted Vigil suffered from Adjustment Disorder with severe depression due to abnormal grieving

over her mother's death.  Additionally, Dr. Murphy opined "[t]he ending of her 13 year live-in

relationship ha[d] certainly added to her depression."  Under Mental Status, Dr. Murphy found:

> In speech and language, she appeared to have normal hearing and she spoke in a normal tone of voice.  She used correct grammar, her speech was audible, understandable and coherent.  The claimant was oriented in all spheres.  The claimant knew the day, month and year as well as the city she was in.  She knew that she had come by car and she could name the current and past president of the USA.  She could name the current but not the past governor of the state.  She knew that the state capitol was Santa Fe.

> When asked to remember 3 words and then repeat them three minutes later, she was able to do so.  She could repeat 6 digits forward and 4 backward.  When asked to name 3 large cities in the US, she said, "New York, Salt Lake City and Sacramento."  She knew that the capitol of the US was Washington, DC; that Tiger Woods was a golfer; and the Isotopes was a baseball team.  She could spell "radio," forward and backward.  The claimant could not count from 100 backward by 7's but could do so by 3's.  She could do addition and subtraction but could not do multiplication.  She was able to demonstrate her ability to make change.  Her judgment was average.  If she found a letter, addressed, stamped and sealed, she would bring it to the post office.  If she were the first one to notice fire in a theater, she would tell the manager.  She knew how a bush and a tree were similar and different as well as how an apple and banana were similar and different.  She correctly interpreted common proverbs: "Don't cry over spilled milk;" and "Don't judge a book by its cover."  The claimant has average intelligence.

> The claimant has the ability to handle her own benefit payments.
> The claimant has the ability to interact with the general public.

 Tr. 146-147.

On February 20, 2005, Leroy Gabaldon, Ph.D., a psychologist and non-examining agency

consultant, reviewed the evidence and opined that Vigil's adjustment disorder was not severe.  Tr.

149-161.  Dr. Gabaldon rated Vigil as having only a _mild_ degree of limitation in the following

functional areas: (1) restrictions of activities of daily living; (2) difficulties in maintaining social

functioning; and (3) difficulties in maintaining concentration, persistence, or pace.  Tr. 159.  Dr.

Gabaldon found Vigil had never experienced "repeated episodes of decompensation." *Id.* Dr.

Gabaldon noted:

> Although Ms. Vigil complains of significant depression, she does not report severe functional limitations. She is able to care for her own personal needs, engage in household tasks and relate with others. She continues to grieve the death of her mother and the end of a relationship. Adjustment disorder, depressed.

Tr. 161.

On October 11, 2005, Vigil returned to UNM Family Practice Clinic. Tr. 182. Arthur

Kaufman, M.D., evaluated Vigil, noting:

> **SUBJECTIVE:**
> The patient is a 46-year-old woman who comes for a check on a few items and needs assignment to a new primary care physician.
>
> **MEDICAL PROBLEMS:**
> 1.      Hypothyroidism
> 2.      Constipation
> 3.      Positive family history of colon cancer
>
> **MEDICATIONS:**
> 1.      Levoxyl 0.1 milligrams once daily.
> 2.      Effexor XR75 milligrams two tablets a day.
> 3.      Ferrous sulfate 324 milligrams once daily.
> 4.      Citrucel two capsules a day.
>
> **ASSESSMENT:**
> 1.      Hypothyroidism. The patient has had varying doses of Synthroid. Her current dose is 0.1. On this dose TSH was 0.3, when the normal low is 0.4. The patient does describe some anxiety and occasional palpations (probably meant palpitations). We discussed the need to repeat the TSH and if it remains low to decrease the Levoxyl dose probably from 0.1 to 0.075 once daily. Blood per rectum. Subjective: The patient has occasional bright red blood per rectum and is chronically constipated. She has been on ferrous sulfate for anemia. Her last hematocrit was 35 nine months ago and she does not take Citrucel regularly and when she does she may take one capsule. The patient drinks very little water and gets no exercise. She had a colonoscopy done one year ago, which showed no polyps, no masses, and only small internal hemorrhoids. Recommendation: Increase exercise to 30 minutes everyday and increase fluids to a minimum of 3 quarts a day and increase Citrucel to two capsules each day. Plan: TSH and CBC to be drawn  today and assigned to new primary care physician.

10

Tr. 182.

On December 20, 2005, Vigil returned to UNM Family Practice Clinic.  Tr. 180.  Dr.

Grebosky evaluated her.  Dr. Grebosky noted:

**HISTORY:**
Tina comes on in today for a discussion of her iron medication.  <u>She is having no problems with this and wants to know whether she needs to be on it.</u>  She has very heavy menses every month.  She has been <u>anemic in the past when she was not taking her medication</u>.  <u>She also wants to know whether she needs to stay on her antidepressants</u>.  She has been having difficulty concentrating.  She is feeling very active.  At times, she cannot sleep at night.  She has never had any problems with sexual indiscretion but short of one time where she slept with another guy to get revenge on her boyfriend.  She has not had difficulties with monetary indiscretion but never has had very many resources to call upon.  She does have thoughts that seem to come into her mind but she does seem to be able to control them at this time but she does get a sense that they may take her over.  She never has hallucinations of auditory or visual nature.  She is taking her thyroid medication at this time as well.  She is not suicidal or homicidal.  <u>She has been off of her medications for three weeks at this time.</u>

**PHYSICAL EXAMINATION:**
The patient is pleasant in no apparent distress, although she does seem somewhat pressured and hypomanic to me.  She is able to put together a good history but really perseverates on different issues and continues to come back to certain issues at this time.  Boyfriend is quite concerned about her today and asks to speak with me.  Core is regular rate and rhythm without murmur.  Lungs are clear to auscultation.

**ASSESSMENT AND PLAN:**
1.      Psychiatric illness– unclear etiology.  She appears hypomanic to me today.  There is no family history of bipolar disorder.  I asked her to talk to Roberto Gomez, M.D., to see if he can help with a diagnosis in this patient.  I have asked that she restart her antidepressant at this time and she will do that.
2.      Hypothyroidism– continue current medications as ordered.
3.      Iron deficiency anemia in past– continue on iron replacement given her heavy menses.
4.      Menorrhagia– as above.  <u>No further current therapy currently needed.</u>
5.      She is to return in one month's time following her consultation with Dr. Gomez.

Tr. 180 (emphasis added).

11

On March 23, 2006, Dr. Gomez, a psychiatrist with UNM Hospital evaluated Vigil.  Dr.

Gomez noted:

**SUBJECTIVE**:
Ms. Ortiz is a patient of Dr. James Grebosky.  This is an initial evaluation.  The entirety of this session was spent in psychiatric consultation, and I will be discussing her management with Dr. Grebosky.

Ms. Tina L. Ortiz is a 47-year-old divorced mother of two who is unemployed.  She presents herself to the clinic today with complaints of poor sleep and tearfulness.  She relates the history of present illness started 11 years ago when her mother died in her company of pulmonary embolism after a total knee replacement.  What aggravates it today is that approximately three weeks ago her boyfriend of two years left her.  Indeed, this is a recurrent pattern in her life with men in her life leaving her.  It is also remarkable that many of her male companions are challenged to be kind human beings and, as a result, are quite abusive and dependent on alcohol.   She is a high school graduate.  Her family is from Tijeras, New Mexico.  She is the third of four children.

She currently lives with her father.  She has two sons, ages 19 and 25, both live outside of the home, and they treat her well.  She makes ends meet on general assistance and food stamps. She is treated for hypothyroidism and takes iron supplements for anemia.

**OBJECTIVE:**
Mental status exam revealed a well dressed and nourished, groomed 47-year-old Hispanic woman who is tearful.  She has a socially appropriate affect initially, and as she tells her story, her mood and affect become more dysphoric.  There is no suicidal or homicidal ideation. There is no evidence of delusions or hallucinations.  She relates that she is currently being treated with Effexor 150 mg a day.  She complains of sustained poor sleep.  There is no exercise in her life.  Content of the loss of her mother, the loss of several boyfriends, the lack of educational opportunities, and she had limited insight into her difficulties.

**ASSESSMENT:**
1.     Dysthymic disorder, chronic.
2.     Hypothyroidism.
3.     Iron deficiency anemia.

**PLAN:**
1.     Increase Effexor to 100 mg b.i.d. #60 with no refills.
2.     I want to reevaluate her in three weeks.

Tr. 178.

On November 13, 2006, Vigil returned to UNM Family Practice Clinic for a follow up of her thyroid and anemia.  Tr. 175-176.  Her past medical history listed (1) hypothyroidism, (2) history of anemia secondary to menorrhagia, and (3) anxiety/depression.  Tr. 175.  The nurse practitioner examined Vigil.  The examination was unremarkable.  The nurse practitioner noted in pertinent part:

**SUBJECTIVE:**
Tina is a 48-year-old female who comes in to clinic for follow up of her thyroid and her iron deficiency anemia.  She has a history of menorrhagia for many years.  She had a normal pelvic ultrasound in 2001.  She reports that her cycles are monthly but primarily heavy the first three days.  She has been on iron for a long time and is here to follow up on her anemia.
She also has a history of hypothyroidism and has been taking her medication on a daily basis. She has not had her TSH checked in over a year.

She also has a history of depression/anxiety.  She previously had been seen by Dr. Roberto Gomez and given Effexor 100 mg b.i.d. but she did not do well on this dosage and self discontinued it.  In the past she has been on Effexor XR 75 mg daily and felt she did better with that dosage.  She currently is feeling sad and depressed being that she is having relationship difficulties with her boyfriend.  He recently cheated on her and can be verbally abusive, but she has decided to forgive him and is continuing the relationship.  She denies any suicidal ideation currently but has had some thoughts in the past, but she has two sons and does not feel she would go through with it.  She currently has a follow up appointment with Dr. Gomez in a couple of weeks but she is interested in resuming the Effexor prior to that appointment.  She also would like her neck examined because at times she feels that she has a lump underneath her right jaw.  It is not always present.  She denies any sore throat.

**OBJECTIVE:**
Vital signs:  Blood pressure 91/65, pulse 64, respirations 14, temperature 36.0, weight 126.9 pounds.
General appearance:  A well developed, well nourished female, pleasant and not in acute distress.
Physical exam:
Neck:  No adenopathy, no thyromegaly, no thyroid nodules, no masses.
Lungs:  Clear to auscultation bilaterally with no wheezes, rales or rhonchi.
Cardiovascular: S1S2, regular rate and rhythm with no murmurs.

**LABORATORY DATA:**
10/11/05:  TSH was normal at 3.610.

**ASSESSMENT AND PLAN:**
1.        Hypothyroidism:  Will check TSH today.

2.      History of anemia secondary to menorrhagia:  CBC with differential done today. She us  to continue her ferrous sulfate 325 mg one p.o. daily.  She was also advised that she is due for her annual Gyn exam.

3.      Depression/anxiety:  Restarted Effexor ER 75 mg one p.o. daily with understanding that she will follow with Dr. Roberto Gomez in two weeks.

Disposition:  I will notify her regarding lab results.  Otherwise she is to follow up with her primary care provider, Dr. Grebosky, she is due for her annual Gyn exam.

175-176.

On January 4, 2007, Vigil went to UNM Hospital emergency room.  Tr. 165-175.  She reported that while waiting at the pharmacy she felt lightheaded and went to her knees.  Tr. 165. On that day, she reported her current medications were Levoxyl 100 mcg and Effexor.  Vigil also complained of "feeling poorly for 3 days."  The examination was unremarkable except for an abnormal urine test.  Her EKG was normal.  The physician assessed Vigil with a urinary tract infection and syncope- likely vasovagal (most common cause of fainting, usually harmless and requires no treatment).  The physician prescribed Cipro for her urinary tract infection and discharged her.

**B.  Credibility Determination**

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on

in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

Vigil contends the ALJ's credibility finding is not linked to substantial evidence and is nothing more than "boilerplate language." Pl.'s Mot. to Reverse at 9. The Court disagrees.

In his decision, the ALJ noted:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> The claimant's hypothyroidism is stable, according to her medical records. Ms. Vigil has heavy menses but has not been advised to have a hysterectomy and should be experiencing menopause in the next few years. The claimant wanted to discontinue her iron supplements, despite the heavy bleeding. Additionally, the claimant was treated for adjustment disorder in the past but chose to discontinue her anti-depressant.
>
> As for the opinion evidence, there are no treating source opinion statements in the record. Dr. Davis, the consultant, did not find any limitations due to hypothyroidism. As noted above, the claimant did not mention her menorrhagia as an issue of concern during the examination. The opinion of Dr. Davis is consistent with the record as a while and is granted some weight.

Tr. 15A-16. Thus, the ALJ set forth the specific evidence he relied on in evaluating Vigil's credibility. Because the ALJ's credibility finding is supported by substantial evidence, it will not be upset.

## C.  Depression Not a Severe Impairment

At step two of the sequential evaluation process, the ALJ found Vigil's adjustment disorder not to be severe, noting: "The claimant has the following non-severe impairment: Ms. Vigil also has a history of an adjustment disorder for which she was treated with Effexor. The claimant decided to discontinue her medication on her own in 2006. At the hearing, the claimant testified that she was still off of her Effexor." Tr. 14.

At step two, Vigil must make a "*de minimis*" showing that her impairment or combination of impairments is medically severe.  *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir. 1997).  At this step, the ALJ considers only a claimant's impairment(s) and evaluates "the impact the impairment would have on h[er] ability to work."  Id.  ""[T]he mere presence of a condition is not sufficient to make a step-two showing."  *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir.2003).  An impairment is not severe if it has no more than a minimal effect on an individual's physical or mental abilities to do basic work activities.  *See* SSR 85-28, 1985 WL 56856, at *3, (1985).  Basic work activities are the "abilities and aptitudes necessary to do most jobs," and include the facility to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting. 20 C.F.R. §416.921(b)(3)-(6).

Vigil contends the ALJ erred at step two of the sequential evaluation process when he found her depression was not a severe impairment.  Vigil also contends that "[b]ecause there is a diagnosis of depression in the record, the ALJ had a duty to develop the record on this issue." Pl.'s Mot. to Reverse at 4.  Vigil also complains  that Drs. Davis and Murphy were not provided her records.

The Court has meticulously reviewed the evidence and finds that substantial evidence supports the ALJ's finding that Vigil's adjustment disorder was not severe.  The record indicates Vigil saw Dr. Gomez on **March 23, 2006**.  On that day, she informed Dr. Gomez that she was taking Effexor 150 mg a day.  Dr. Gomez increased her dose to 100 mg twice a day and directed her to return in 3 weeks for reevaluation.  Vigil did not return to see Dr. Gomez.  The next visit was on **November 13, 2006**, when Vigil returned to UNM Family Practice Clinic for a follow up

16

of her thyroid and anemia.  On that day, Vigil informed the nurse practitioner that she had been seen by Dr. Gomez and given Effexor 100 mg twice a day but discontinued it because "she did not do well on this dosage."  Vigil informed the nurse practitioner that she wanted to resume taking Effexor and that she had a "follow up appointment with Dr. Gomez in a couple of weeks."  The nurse practitioner prescribed Effexor 75 mg daily with the understanding that she would follow up with Dr. Gomez in two weeks.  The record does not indicate that Vigil returned to see Dr. Gomez but returned to University Hospital on **January 4, 2007**, when she fainted and was taken to the emergency room.  Vigil also testified at the administrative hearing that she had been off Effexor for two weeks.

The record further indicates Vigil reported "increased sadness" on **February 27, 2004**. Tr. 129.  At that time, Vigil requested a "trial of St. John's Wort" for her depression.  Notably, Vigil did not return to primary care physician for reevaluation of her depression as directed by the nurse practitioner.  It was not until sometime after **September 29, 2004**, that Vigil returned to UNM hospital when she reported "increased stressors due to her boyfriend of 13 years leaving her."  Tr. 143.

Additionally, on February 5, 2005, Dr. Murphy evaluated Vigil and opined she had the ability to interact with the general public, was oriented in all three spheres, could remember 3 words and then repeat them three minutes later, could repeat 6 digits forward and 4 backward, and had average judgment.

Dr. Gabaldon reviewed the record, including Dr. Murphy's evaluation, and opined Vigil's adjustment disorder was not severe based on Vigil being only mildly limited in her activities of

daily living, her ability to maintain social functioning and in her ability to maintain concentration, persistence or pace.  The record supports Dr. Gabaldon's findings.

Vigil reported she lived with her father and took care of herself and him.  She reported she cleaned his house, cooked for both of them and washed his clothes too.   Tr. 89.  Vigil also reported she could drive but didn't have a car, went shopping for groceries, read, watched television, walked every day for exercise, went to church once a week, visited with her sons, her sister and her brother.  Tr. 92.   Notably, Vigil reported she could pay attention "For as long as I need to, when someone's talking to me," could follow written instruction "well," could follow spoken instruction "Good," and "could handle the routine well, even in changes."  Tr. 93-94.  Vigil also testified cleaning her younger son's double-wide trailer twice a week.  Tr. 208 ("They live– one is married and the other one lives in Alameda.  I go clean his– he has a double-wide trailer.  I go clean – I help him out–.   I see my youngest one like about twice a week.  Sometimes he picks me up and drops me off over there.  My dad does too.  So I clean his house.").  Finally, when Vigil completed a form required by Dr. Davis prior to his evaluation, Vigil noted she cleaned her house, prepared meals, washed dishes, did the laundry, shopped for food, read, watched television, listened to the radio/stereo, ate out, took walks, took care of children, bathed, brushed her teeth, changed her own clothes, and her hobby was going to the flea market.  Tr. 136.

Thus, while Vigil was diagnosed with adjustment disorder with depression and was prescribed medication, she has not met her burden and the record does not demonstrate that her depression was severe enough to prevent her "from engaging in virtually any 'substantial gainful work.'"  *Barnhart v. Walton* 535 U.S. 212, 218-220 (2002).

Alternatively, even if Vigil's depression met the *de minimus* standard, the record indicates that the ALJ considered the effect of all of her medically determinable impairments, both those he deemed "severe" and those "not severe."[1]  *See* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe.").  After delineating the kind of evidence the regulations required he consider, the ALJ noted in his decision:

> The claimant testified that she had hair loss due to hypothyroidism, extremely heavy menses for seven days at a time requiring her to lie down for the first two days of her cycle.  Ms. Vigil reported that she had not been advised by her doctors to have a hysterectomy and that her thyroid hormone dosage had been changed twice in 11 years.  <u>The claimant reported depression due to witnessing her mother's death of a probable pulmonary embolism in 1994. Ms. Vigil stated that she was unable to control her crying and that it took her three hours to get ready to leave her house due to concentration and memory problems</u>.  The claimant lives with her father, sons and a grandson.  The claimant cleans house, cooks and cares for the grandchild.  In her paperwork, the claimant reported that she liked to shop at flea markets as a hobby.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

---

[1] In *Hill v. Astrue*, No. 07-4226, 2008 WL 3339174 (10th Cir. Aug. 12, 2008), the Tenth Circuit found reversal was not required when the ALJ erred in finding claimant's arthritis was not severe at step two, stating:

> Thus, under a *de minimus* standard, the ALJ's finding that arthritis was not a medically determinable impairment appears to be unsupported by substantial evidence.

> This error does not require reversal, however.  Once the ALJ finds that the claimant has *any* severe impairment, he has satisfied the analysis for purposes of step two.  His failure to find that additional alleged impairments are also severe is not in itself cause for reversal.  But this does not mean that the omitted impairment simply disappears from his analysis.  In determining the claimant's RFC, the ALJ is required to consider the effect of *all* the claimant's medically determinable impairments, both those he deems "severe" and those "not severe."

*Id.* at *2 (internal citations omitted).

The claimant's hypothyroidism is stable, according to her medical records. Ms. Vigil has heavy menses but has not been advised to have a hysterectomy and should be experiencing menopause in the next few years. The claimant wanted to discontinue her iron supplements, despite the heavy bleeding. <u>Additionally, the claimant was treated for an adjustment disorder in the past but chose to discontinue her anti-depressant.</u>

As for the opinion evidence, there are no treating source opinion statements in the record. Dr. Davis, the consultant, did not find any limitations due to hypothyroidism. As noted above, the claimant did not mention her menorrhagia as an issue of concern during the examination. The opinion of Dr. Davis is consistent with the record as a whole and is granted some weight.

Tr. 15A-16 (emphasis added). Thus, the ALJ considered Vigil's allegations, found her not entirely credible, and addressed each impairment, even those he found to be "not severe."

**D. RFC Determination**

Vigil also challenges the ALJ's RFC findings. Vigil contends "[t]he ALJ's RFC analysis consists of a review of [her] testimony, . . . "statements [that] do not provide the direct link between relevant evidence and the RFC finding, which the law requires." Pl.'s Mot. to Reverse at 8.

However, the record shows that the ALJ properly considered Vigil's testimony as to her alleged work-related restrictions (to the extent it was not discredited), the observations of her treating physicians and the medical records, as required. *See* 20 C.F.R. §§ 416.945(a), 416.946 (responsibility for determining RFC rests with ALJ; determination should be based on all relevant evidence, including claimant's own description of limitations, observations of treating physicians and others, and medical records). Contrary to Vigil's assertion, the ALJ did provide "the direct link between relevant evidence and the RFC finding." The ALJ noted:

The claimant has a long history of heavy bleeding during her menstrual cycle which has required iron supplementation. Ms. Vigil was also diagnosed with hypothyroidism in 1995 and has been prescribed replacement thyroid hormone. Ms. Vigil's thyroid hormone dosage was decreased in October 2005. The claimant's TSH blood test in November 2005 was normal. (Exhibit 8F/2). In December 2005, the claimant was seen at the Family Practice

Clinic and inquired as to whether she still needed iron supplementation. The claimant was advised to continue taking iron due to heavy bleeding and past anemia without the supplements. The claimant was seen in November 2006 for follow-up. The gynecologic nurse practitioner noted that prior to November 2006, the claimant had not had her TSH levels checked in over a year. Ms. Vigil had a fainting episode in January 2007 which was thought to be related to hypothyroidism but was diagnosed as due to a bladder infection and a probable vasovagal syncopal episode.

** ** ** **

A physical consultative examination was held in November 2004. Dr. G.T. Davis examined the claimant. The claimant related that she had fatigue and generally felt tired, despite taking thyroid replacement hormone and having normal TSH levels. Ms. Vigil stated that her levels were checked every three months. Interestingly, the claimant did not mention menorrhagia but stated that she had once had rectal bleeding and was anemic from that. The exam was unremarkable, except for the claimant's slightly elevated blood pressure. Dr. Davis advised the claimant to follow-up with her primary care provider. The doctor noted that the claimant had about a ten-year history of hypothyroidism, apparently effectively treated with medication, to which her reports of fatigue could not be correlated. Dr. Davis noted the claimant's history of depression and thought that there might be a psychological component to her fatigue. The doctor concluded that he saw "nothing on the endocrinologic, musculoskeletal or neurological examination" which would cause any limitations or restrictions in life or work activities. (Exhibit 2F/3). The doctor recommended that the claimant seek help through the New Mexico Division of Vocational Rehabilitation.

Tr. 14-15. The ALJ also noted there was no treating source opinion statements in the record. Tr. 15A. Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

## E.  Medical-Vocational Guidelines (the grids)

Vigil next contends that "because the ALJ found that [her] fatigue is a severe impairment, it was legal error to apply the grids conclusively without the assistance of a VE." Pl.'s Mot. to Reverse at 7. Accordingly, Vigil moves the Court to remand this action to allow the ALJ to consult with a VE "regarding the effects of fatigue on the occupational base." *Id.*

First, the Court notes that Vigil was represented by counsel and, more importantly, that a vocational expert (VE) was present at the hearing. Although it is the Commissioner's burden at

step five to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience, nonetheless, Vigil's counsel had the opportunity to question the VE "regarding  the effects of [Vigil's] fatigue on the occupational base" if he considered this vital to her case. *Cf. Gibbons v. Barnhart*, 85 Fed.Appx. 88, 93 (10th Cir. 2003), quoting *Carey v. Apfel*, 230 F.3d 131, 146-147 (5th Cir. 2000)("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between specific testimony of a [VE] and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.").

Nevertheless, the Court finds that the ALJ properly relied on the grids.  In his decision, the ALJ found Vigil retained the RFC to perform "a full range of medium work."  Tr. 15.  Under the regulations,

> The functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a **severely impaired** individual retains the functional capacity to perform medium work.

20 C.F.R., Pt. 404, Subpt. P, App. 2, §203(b)(emphasis added).  The Court has already found that substantial evidence supports the ALJ's RFC finding.

Vigil submitted a statement on January 30, 2007, stating her "fatigue affects my ability to concentrate and makes my memory very poor."  Tr. 123.  Dr. Murphy, a psychologist, found Vigil's activities of daily living to be in the normal range and opined she was oriented in all spheres and had average intelligence. Tr. 144.  Dr. Murphy also found Vigil's thought processes to be normal and her responses to questions appropriate and detailed.  Significantly, Vigil was

able to remember 3 words and recall them three minutes later, could repeat 6 digits forward and 4 backward, could name 3 large cities in the United States, knew the capitol of the United States, could spell "radio" forward and backward, could count from 100 backward by 3's, could do addition and subtraction, and opined her judgment was average.   Thus, Dr. Murphy's evaluation and the record as a whole support the ALJ's finding that Vigil's fatigue did not preclude her from performing a full range of medium work.   Because the ALJ found that Vigil's nonexertional limitation imposed no significant restriction on the range of work she was exertionally able to perform, reliance on the grids was appropriate.  *See Hargis v.* Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1994)("The grids should not be applied conclusively . . . unless the claimant could perform the full range of work required of that category . . . ."), *see also, Ortiz v. Secretary of Health and Human Servs.*, 890 F.2d 520, 524-25 (1st Cir. 1989)("If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid . . . can be relied on exclusively . . . .").

**F.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied. After such review, the Court is satisfied that substantial evidence supports the ALJ's finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**